United General Title Insurance Company, appellant,
v. Daniel Malone et al., appellees.

___ N.W.2d ___

Filed January 30, 2015.    No. S-13-1002.

1. **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. **Jury Instructions.** Whether the jury instructions given by a trial court are correct is a question of law.

3. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.

4. **Pleadings: Appeal and Error.** Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.

5. **Directed Verdict: Evidence.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

6. **Judgments: Verdicts.** To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion.

7. **Torts: Conversion: Property: Words and Phrases.** Tortious conversion is any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights.

8. **Torts: Conversion: Property: Proof.** In order to maintain an action for conversion, the plaintiff must establish a right to immediate possession of the property at the time of the alleged conversion.

9. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

10. **Contribution: Words and Phrases.** Contribution is defined as a sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification.

11. **Contribution: Parties: Liability.** The prerequisites to a claim for contribution are that the party seeking contribution and the party from whom it is sought share a common liability and that the party seeking contribution has discharged more than his fair share of the common liability.

12. **Contribution: Restitution: Unjust Enrichment: Liability.** Both indemnity and contribution rest on principles of restitution and unjust enrichment. A party has a claim for indemnification if it pays a common liability that, as between itself and another party, is altogether the responsibility of the other party. A claim for contribution arises when a party has paid more than its fair share

of a common liability that is allocated in some proportion between itself and another party.

13. **Liability: Damages.** Generally, the party seeking indemnification must have been free of any wrongdoing, and its liability is vicariously imposed.

14. **Trusts: Property: Title: Unjust Enrichment: Equity.** A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment.

15. **Trusts: Property: Title: Equity: Proof.** Regardless of the nature of the property upon which a constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

16. **Trusts: Property.** Where money is the asset upon which a trust is based, it is necessary that the specific amounts be identified and located, either by tracing the money to a specific and existing account, or where the funds have been converted into another type of asset such as by the purchase of real property, the money must be traced into the item of property.

17. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

18. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.

19. ____: ____. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

20. **Conspiracy: Words and Phrases.** A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

21. **Conspiracy: Torts.** A conspiracy is not a separate and independent tort in itself, but, rather, is dependent upon the existence of an underlying tort.

22. **Conspiracy: Damages.** The gist of an action for civil conspiracy is not the conspiracy charged, but the damages the plaintiff claims to have suffered because of the wrongful acts of the defendants.

23. **Conspiracy: Liability.** By establishing a civil conspiracy, a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission.

24. **Jury Instructions: Appeal and Error.** Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error.

25. **Rules of the Supreme Court: Pleadings.** The key inquiry of Neb. Ct. R. Pldg. § 6-1115(b) for "express or implied consent" to trial of an issue not presented by the pleadings is whether the parties recognized that an issue not presented by the pleadings entered the case at trial.

26. **Pleadings.** Implied consent to trial of an issue not presented by the pleadings may arise in two situations: First, the claim may be introduced outside of the complaint—in another pleading or document—and then treated by the opposing party as if pleaded. Second, consent may be implied if during the trial, the party acquiesces or fails to object to the introduction of evidence that relates only to that issue.

27. **Pleadings: Proof.** Implied consent to trial of an issue not presented by the pleadings may not be found if the opposing party did not recognize that new matters were at issue during the trial. The pleader must demonstrate that the opposing party understood that the evidence in question was introduced to prove new issues.

28. **Rules of the Supreme Court: Pleadings.** To satisfy Neb. Ct. R. Pldg. § 6-1115(b) and demonstrate implied consent to trial of an issue not presented by the pleadings, evidence to which no objection is raised must be directed solely at the unpleaded issue, in order to provide a clear indication that the opposing party would or should have recognized that a new issue was being injected into the case.

29. **Courts: Pleadings.** A court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.

30. ____: ____. A trial court's denial of leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the nonmoving party can be demonstrated.

31. **Contracts: Equity.** Absent a contractual arrangement, the right to indemnity has its roots in equity.

32. **Liability: Damages.** Indemnification is available when one party is compelled to pay money which in justice another ought to pay, or has agreed to pay, unless the party making the payment is barred by the wrongful nature of his conduct.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Thomas M. Locher and Matthew E. Eck, of Locher, Pavelka, Dostal, Braddy & Hammes, L.L.C., for appellant.

Robert F. Peterson and Kathleen M. Foster, of Laughlin, Peterson & Lang, for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Cassel, J.

# I. INTRODUCTION

Improper transfers were made from a title insurance agent's escrow account. The agent's principal, United General Title Insurance Company (United General), paid the loss pursuant to a statute.[1] Relying upon numerous legal theories, it sued to recover the loss from multiple persons and entities, including recipients of the transferred funds. Although it recovered judgment against some persons and entities, summary judgment was entered against it on various claims. After a jury trial, several recipients successfully defended the action on the remaining issues. United General appeals.

As we will explain in more detail, the district court correctly granted summary judgment on United General's claim for contribution but erred in doing so on its claims for conversion and a constructive trust. At trial, the court properly rejected a proposed jury instruction, denied amendment of the complaint, and partially directed a verdict. After trial, it correctly granted a motion for judgment notwithstanding the verdict. We affirm in part, and in part reverse and remand for further proceedings.

# II. BACKGROUND

## 1. Parties

United General is a title insurance company authorized to issue title insurance commitments and policies of insurance in Nebraska. Several years before the improper transfers were discovered, it entered into a "Title Insurance Agency Agreement" with A.G. Ventures, LLC, doing business as Guardian Title Services (Guardian). The agreement authorized Guardian to originate and solicit applications for United General's title insurance products in Nebraska. It essentially permitted Guardian to issue title insurance policies underwritten by United General. As part of the agreement, Guardian was to collect premiums, earnest deposits, and other payments from customers and hold them in escrow for disbursement.

---

[1] See Neb. Rev. Stat. § 44-1993(8) (Reissue 2010).

From January to September 2008, Guardian was owned solely by Daniel Malone. Guardian was managed by Investment Property Resources, Ltd. (IPR), a management and brokerage company owned by Malone and his wife. IPR managed several other entities in which Malone had an interest. These entities included Maple Office Partners, LLC, in which Malone had a membership interest, and Via Christe, L.L.C., of which Malone was the managing member. In addition to these entities, IPR also managed Northwest Village 2nd Addition Homeowners Association, Inc. (Northwest Village), and Angel Guardians, Inc.

## 2. Shortage

In July 2008, a shortage was discovered in one of Guardian's escrow accounts. United General advised its parent company of the shortage, and auditors were dispatched to assess the situation. The auditors ultimately determined that $588,671.80 was missing from the escrow account and that Guardian had failed to remit premiums for title insurance policies to United General in the amount of approximately $22,000. United General's parent company made immediate arrangements to cover the shortage by transferring $588,000 from United General to Guardian. United General also terminated its agency agreement with Guardian, and the Nebraska Department of Insurance prohibited Guardian from conducting further real estate closings.

In the investigation of the shortage, the auditors determined that frequent transfers of substantial amounts were made between Guardian's escrow account and its operating account. Some of the transferred funds remained in the operating account, while subsequent transfers were made to IPR, entities managed by IPR, or entities in which Malone had an interest. Further transfers were made between these entities in varying amounts. One auditor opined that the "majority of the money transferred out was used to keep the various businesses owned by . . . Malone functioning." The auditor further provided, "If you remove the transfers in and out . . . from each account none of the businesses would show a profit."

### 3. Complaint

After paying the loss, United General filed a complaint against 16 named defendants and 3 unknown entities associated with Malone or IPR. The defendants relevant to this appeal included:

• Malone;
• Tara Heitkamp (IPR's primary business manager);
• Guardian;
• Via Christe;
• IPR;
• Fidelis, LLC;
• Northwest Village;
• Angel Guardians;
• Maple Office Partners; and
• M & M Property Partners.

In its complaint, United General asserted 12 causes of action seeking to recover the unpaid premiums and the funds it had paid out to cover the shortage. The causes of action and their key factual allegations relevant to this appeal included:

• Conversion—One or more of the defendants intentionally converted United General's property, causing it damages in the amount of at least $22,000.
• Civil conspiracy—Guardian, Heitkamp, Malone, and the remaining defendants acted to accomplish the unlawful taking of funds from Guardian's escrow account and used the funds for improper and illegal purposes.
• Common-law indemnification—One or more of the defendants was obligated to indemnify United General.
• Contribution—One or more of the defendants was obligated to contribute to the loss sustained by United General.
• Constructive trust—One or more of the defendants received funds transferred from Guardian's escrow account as a result of fraud, misrepresentation, or an abuse of an influential or confidential relationship and were unjustly enriched.

In its prayer for relief, United General requested judgment against the defendants in the amount of at least $588,671.80.

### 4. SUMMARY JUDGMENT

In January 2011, several of the defendants moved for summary judgment. The moving defendants included Malone, Via Christe, Northwest Village, Angel Guardians, M & M Property Partners, Maple Office Partners, and Fidelis.

At the summary judgment hearing, two affidavits of Ellen Roethler, a former employee of IPR, were received into evidence. In her affidavits, Roethler explained that she examined each deposit slip and bank statement for several of the defendant entities in order to determine if they were benefited by the unauthorized transfers of funds into and out of their accounts. She ultimately concluded that (1) Via Christe sustained a net loss of $14,926.36, (2) Northwest Village was not financially impacted by the unauthorized transfers, (3) M & M Property Partners received net deposits of $241,046.66, (4) Angel Guardians received net deposits of $12,500, and (5) Maple Office Partners received net deposits of $2,500.

The district court also received two affidavits of Malone. Malone averred that M & M Property Partners was a partnership between himself and another individual that terminated in 2002. One of the partnership's bank accounts was not closed and remained dormant for several years. In 2006, Malone began to use the bank account for his personal use. Malone further provided that he had authorized deposits into the account in the amount of $230,500 to receive the proceeds from the sale of his interest in Via Christe. However, he acknowledged that the remaining transactions noted by Roethler involving M & M Property Partners were unauthorized. Finally, he claimed that he had filed for personal bankruptcy in July 2010 and that his debts were discharged in October.

As to Guardian's escrow account, Malone explained that "Guardian was required to keep escrow deposits received from customers, especially from prospective home buyers, in an escrow account, and some of these funds were subsequently to be paid to United General as insurance premium costs, when the transaction was completed."

The district court entered an order in August 2011 disposing of the motions for summary judgment. The court first entered

summary judgment on United General's claim for conversion. The court observed that "United General was never entrusted with the escrowed funds and never possessed the escrowed funds, nor did United General ever have the right to unconditionally and immediately repossess any of the escrowed funds." The court determined that without an immediate right to possess the escrowed funds, United General's conversion claim must fail.

The district court also granted the moving defendants summary judgment on United General's claims for contribution and a constructive trust. The court observed that a claim for contribution requires a mutual liability or a jointly committed wrong. While genuine issues of material fact existed as to whether the moving defendants were liable for conversion, United General was statutorily liable for the loss. Thus, no jointly committed wrong existed between United General and the defendants. As to a constructive trust, the court concluded that United General "had no ownership interest, equitable or otherwise, in the $588,671.80 of escrowed funds." And although United General could claim an interest in the $22,000 of unpaid premiums, the unpaid premiums could not be traced to any specific defendant or account.

But the district court determined that summary judgment was inappropriate on United General's claims of civil conspiracy and indemnification. Consequently, it ordered that a jury trial be conducted on those claims.

## 5. TRIAL

At trial, a representative from United General's parent company testified as to the real estate closing process and the handling of premiums for title insurance products. In almost every closing involving Guardian, a party was issued a United General title insurance policy. At closing, Guardian would write itself a check from its escrow account to its operating account to reflect that it had earned payment. A portion of that payment would be for the title insurance policy premium. The agency agreement between United General and Guardian provided that Guardian was entitled to 80 percent of the premium and United General was entitled to 20 percent. The

representative testified that in the course of the investigation of the shortage in Guardian's escrow account, it was discovered that Guardian had performed 309 closings for which it had failed to send United General its portion of the policy premium, amounting to $28,000.

A certified public accountant testified that he reviewed the bank statements and check registers for several of the defendant entities, as well as various affidavits and reports. The accountant indicated that the first transfer of funds from Guardian's escrow account to the defendant entities was made on April 1, 2007. The accountant testified that M & M Property Partners received $65,100 from the escrow account, IPR received $101,570, Via Christe received $247,600, Maple Office Partners received $18,800, Northwest Village received $5,700, Angel Guardians received $8,000, and Malone received $13,000. The accountant testified that in all, $561,500 was transferred from Guardian's escrow account.

Malone testified that the shortage in the escrow account came to his attention near the end of July 2008. On a Friday morning, he received a call from a bank that a check for $500,000 had been returned by another bank. The amount of the check "took [Malone's] breath away," because a check that large would be associated only with a closing. Malone called Heitkamp and told her to meet him at the bank.

At the bank, Malone and Heitkamp met with several bank representatives. According to Malone, Heitkamp explained that she had written the returned check in order to deposit money in the escrow account and accrue interest. But Malone testified that the situation was "very unusual" because he did not "tell [Heitkamp] to get creative and move money around." Heitkamp claimed that the initial presentation of the check for payment, its return, and its subsequent re-presentation had created a "backlog in the Federal Reserve system" that would clear itself in the next few days.

A waiting period of 3 or 4 days began in order to see if the deposits would clear and if the shortfall would be corrected. On the following Friday, Heitkamp came into Malone's office and told him that she had received the bank statement for the

escrow account and would balance the account over the weekend. However, Malone testified that he never saw Heitkamp again except during a deposition and at trial.

Malone alerted United General to the shortage, and auditors were sent to investigate. Malone testified that the bank statements for the entities managed by IPR revealed "all types of activity that was certainly not customary nor authorized." Malone explained that the activity consisted of 25 to 30 checks in large amounts going into and out of the entities' accounts every month. He described the activity as "[m]illions of dollars being washed around these accounts."

Malone testified that the checks going into and out of the entities' accounts were stamped with his signature by a stamp that he had given to Heitkamp "[s]trictly to execute customary and published and announced checks that we'd had every month." Malone testified that although Heitkamp was not authorized to make withdrawals from Guardian's escrow accounts, he had such authorization. He further provided that there were multiple online transfers originating from Heitkamp's desk.

According to Malone, the unauthorized transfers did not appear on anything he ever saw. And he testified that he never observed anything on the entities' tax returns that alerted him to any issues. Malone opined that Heitkamp was making the unauthorized transfers without recording them or was maintaining a separate set of books. He testified that he was never able to determine the ultimate destination of the funds transferred from Guardian's escrow account.

And Malone explained that the shortage in the escrow account ultimately caused him to claim personal bankruptcy and close his real estate business. He explained that IPR sold its assets to Fidelis, a Nebraska real estate company started by Malone's son and owned by Malone's daughter and her husband at the time of trial. Fidelis purchased IPR's assets in an "Asset Purchase Agreement" for $5,500. The agreement had an effective date of September 1, 2008, and provided that Fidelis did not assume any of IPR's liabilities. Malone testified that IPR closed its business at "year-end December of

2008." He further indicated that Fidelis was not in existence when the unauthorized transfers were made from Guardian's escrow account.

The district court also received testimony from several individuals with interests in the entities managed by IPR. A developer who was a property owner in Northwest Village testified that prior to the present litigation, he had no knowledge of any issues regarding the association's bank account. He explained that during the period of time that the association was managed by IPR, the association's bank statements were received by IPR. The developer also indicated that he had an interest in Via Christe and that Via Christe's bank statements were received by IPR. He confirmed that he had no knowledge of Via Christe's taking or using any funds that it had not generated or borrowed.

An owner of Maple Office Partners similarly testified that prior to August 2008, he had no knowledge of the funds going into and out of Maple Office Partners' bank account. He explained that he received monthly reports from IPR, but that the reports did not give any indication of unauthorized funds. And he confirmed that the reports did not include Maple Office Partners' bank statements.

Finally, Roethler testified and restated much of the analysis contained within her affidavits. However, she indicated that her earlier analysis of Via Christe erroneously identified a $15,000 disbursement as being unauthorized. Thus, she testified that the net effect of the unauthorized transactions on Via Christe was "pretty close to zero."

At the close of all the evidence, Fidelis asserted that the claims against it should be dismissed because it was not in existence when the funds were transferred from Guardian's escrow account. In response, United General made an oral motion to amend the complaint to add a claim of successor liability, arguing that Fidelis was a continuation of IPR. The district court overruled United General's motion to amend and stated that it was dismissing Fidelis. It explained that it believed Fidelis would have likely presented a different defense or offered additional evidence had the complaint made an allegation of

successor liability. The court subsequently entered a directed verdict in Fidelis' favor.

United General timely requested a proposed jury instruction that the district court rejected. The instruction addressed a party's liability for a claim of civil conspiracy and provided: "'As a general rule, one who counsels, commands, directs, advises, assists or aids and abets another individual in commission of a wrongful act or tort is responsible to the injured party for the entire loss or damage.'" The court observed that the instruction was a correct statement of the law, but it determined that the instruction was not warranted.

After the jury instructions were settled, the court submitted United General's remaining claims to the jury. On United General's civil conspiracy claim, the jury returned verdicts in favor of Maple Office Partners, Via Christe, Northwest Village, and Angel Guardians, but it returned verdicts against M & M Property Partners and Heitkamp. On United General's claim for indemnification, the jury returned verdicts against Maple Office Partners, Via Christe, Northwest Village, M & M Property Partners, Angel Guardians, and Heitkamp.

### 6. POSTTRIAL MOTION

After the trial, several of the defendants moved for "Judgment on Common-law Indemnification." The moving defendants included Maple Office Partners, Via Christe, Northwest Village, Angel Guardians, and M & M Property Partners. The district court characterized the motion as a motion for judgment notwithstanding the verdict and entered judgment in favor of Maple Office Partners, Via Christe, Northwest Village, and Angel Guardians on United General's indemnification claim. The court observed that by returning verdicts in favor of these defendants on the civil conspiracy claim, the jury had found them to be without fault for the embezzlement from Guardian's escrow account. It therefore determined that there was no basis to grant indemnification.

### 7. APPEALS

United General filed a timely notice of appeal, and the case was assigned to the docket of the Nebraska Court of Appeals.

However, the Court of Appeals dismissed the case for lack of jurisdiction for failure to dispose of all the claims of all the parties. After obtaining an "Omnibus Order" providing for missing orders, United General filed a second timely notice of appeal. But the Court of Appeals again dismissed for lack of jurisdiction. The district court entered an order certifying a final order pursuant to Neb. Rev. Stat. § 25-1315 (Reissue 2008), and United General filed a third timely notice of appeal. We moved the case to our docket pursuant to statutory authority.[2]

## III. ASSIGNMENTS OF ERROR

As to the entry of summary judgment, United General assigns that the district court erred in concluding that it could not maintain actions for conversion, contribution, or a constructive trust against the moving defendants.

With respect to the trial, United General assigns that the district court erred in (1) refusing to give its requested jury instruction regarding liability for civil conspiracy, (2) denying its motion to amend the complaint and entering a directed verdict in Fidelis' favor, and (3) granting judgment notwithstanding the verdict on its claim for indemnification.

## IV. STANDARD OF REVIEW

[1] Summary judgment is proper if the pleadings and admissible evidence offered show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[3]

[2,3] Whether the jury instructions given by a trial court are correct is a question of law.[4] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[5]

---

[2]  See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

[3]  *Roos v. KFS BD, Inc.*, 280 Neb. 930, 799 N.W.2d 43 (2010).

[4]  *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008).

[5]  *Id.*

[4] Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.[6]

[5] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[7]

[6] To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion.[8]

## V. ANALYSIS

We first address United General's assignments of error regarding the entry of summary judgment. We then turn to the errors that it asserts occurred at trial.

### 1. Summary Judgment

#### (a) Conversion

United General claims that the district court erred in concluding that it could not maintain an action for conversion against the moving defendants. It argues that genuine issues of material fact existed as to all of the elements of conversion.

However, we constrain our analysis to the element upon which the district court granted summary judgment—whether United General had a right to immediate possession of the escrowed funds when the funds were embezzled from the escrow account. And we further limit our review to the evidence received at the summary judgment hearing.

[7,8] We have defined tortious conversion as any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights.[9]

---

[6] *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

[7] *Credit Bureau Servs. v. Experian Info. Solutions*, 285 Neb. 526, 828 N.W.2d 147 (2013).

[8] *Martensen v. Rejda Bros.*, 283 Neb. 279, 808 N.W.2d 855 (2012).

[9] See *Baye v. Airlite Plastics Co.*, 260 Neb. 385, 618 N.W.2d 145 (2000).

And our case law makes clear that in order to maintain an action for conversion, the plaintiff must establish a right to immediate possession of the property at the time of the alleged conversion.[10]

We agree with the district court that United General had no right to immediate possession of the escrowed funds comprising the deposits of Guardian's customers. United General had no interest in these funds and was never entrusted with their possession. Malone's affidavit provided that the escrow deposits were "deposits received from customers, especially from prospective home buyers." And the agency agreement between United General and Guardian prohibited Guardian from "[r]eceiv[ing] any funds, including escrow or closing funds, in the name of [United General]; any such funds shall be received by [Guardian] in its own name and for its own account . . . ." Thus, to the extent that the escrowed funds belonged to Guardian's customers, the court was correct in granting summary judgment.

[9] However, viewed in the light most favorable to United General, the evidence established genuine issues of material fact. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[11]

First, a factual issue existed as to whether some portion of the escrowed funds comprised the unpaid premiums owed to United General. In their affidavits, Roethler and Malone indicated that Guardian held funds from premiums in its escrow accounts. And the representative from United General's parent company averred that Guardian was responsible for keeping and holding insurance premiums in escrow. Further, the letter from the auditor provided that unpaid premiums were missing from Guardian's escrow account.

---

[10] See, e.g., *id.*; *Zimmerman v. FirsTier Bank*, 255 Neb. 410, 585 N.W.2d 445 (1998); *Prososki v. Commercial Nat. Bank*, 219 Neb. 607, 365 N.W.2d 427 (1985).

[11] *Shada v. Farmers Ins. Exch.*, 286 Neb. 444, 840 N.W.2d 856 (2013).

Another genuine issue of material fact existed as to whether any of the funds transferred from Guardian's escrow account included the unpaid premiums owed to United General. Viewed in the light most favorable to United General, the evidence regarding the transferred funds was sufficient to support an inference that some or all of the respective transfers included unpaid premiums.

And it is clear that United General had an immediate right to possess the unpaid premiums which it was owed. The agency agreement provided that immediately upon the receipt of premiums for title insurance products, United General's portion of the premium was its sole and separate property to be held by Guardian in trust for United General's benefit. As a matter of law, this interest in the unpaid premiums was sufficient to prevent summary judgment against United General. The district court therefore erred in granting summary judgment on United General's conversion claim.

## (b) Contribution

United General contends that the district court erred in granting summary judgment on its claim for contribution, because both it and the moving defendants were potentially liable to Guardian's customers for the shortage in the escrow account. It argues that it shared a common liability with the defendants for which it was entitled to seek contribution at trial.

[10,11] Contribution is defined as a sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification.[12] "'The prerequisites to a claim for contribution are that the party seeking contribution and the party from whom it is sought share a common liability and that the party seeking contribution has discharged more than his fair share of the common liability.'"[13]

The district court determined that United General could not seek contribution from the moving defendants, because it and the moving defendants did not jointly convert the escrowed funds. As we have already observed, genuine issues of material

---

[12] *Estate of Powell v. Montange*, 277 Neb. 846, 765 N.W.2d 496 (2009).

[13] *Id.* at 849-50, 765 N.W.2d at 500, citing 18 C.J.S. *Contribution* § 5 (1990).

fact existed as to whether the moving defendants were liable to Guardian's customers for conversion. But United General was liable to Guardian's customers solely pursuant to a statutory mandate.[14] It could not be liable for conversion, because the transfers of the escrowed funds were outside the scope of Guardian's authority under the agency agreement. Thus, the court reasoned that without a jointly committed wrong, there was no common liability to support United General's claim for contribution.

Although we ultimately agree that United General could not seek contribution, we disagree with its reasoning. At the summary judgment stage, United General established a potential common liability between itself and the moving defendants—each was potentially liable for the shortage in Guardian's escrow account. And this potential liability was owed to the same persons, Guardian's customers. United General's liability was imposed by statute, while the moving defendants were potentially liable to Guardian's customers for a conversion of their escrowed funds. Thus, both United General and the moving defendants were at least potentially liable to the same persons for the same wrong. In that sense, it was a common liability. Further, by covering the shortage in the escrow account, United General extinguished any liability of the moving defendants to Guardian's customers. However, this common liability adduced at the summary judgment stage supported a claim for indemnification, not contribution.

[12] According to the Restatement (Third) of Restitution and Unjust Enrichment, both indemnity and contribution rest on principles of restitution and unjust enrichment.[15] A party has a claim for indemnification if it pays a common liability that, as between itself and another party, is altogether the responsibility of the other party.[16] In contrast, a claim for contribution arises when a party has paid more than its fair share of a common

---

[14] See § 44-1993(8).

[15] See Restatement (Third) of Restitution and Unjust Enrichment § 23, comment *a*. (2011).

[16] See *id*.

liability that is allocated in some proportion between itself and another party.[17]

[13] Our case law reflects this distinction. As noted above, we have defined contribution as the sharing of the cost of an injury as opposed to the complete shifting of the cost from one to another, which is indemnification.[18] And we have stated that generally, the party seeking indemnification must have been free of any wrongdoing, and that its liability is vicariously imposed.[19]

In *Warner v. Reagan Buick*,[20] we determined that the defendant's third-party complaint was for indemnification, although the complaint made no mention of "indemnity." In that case, the purchaser of a used automobile filed suit to recover damages from the dealer-seller. The dealer-seller filed a third-party action against the seller from which it had purchased the automobile, alleging that its liability should be imposed against the third party. We concluded that the complaint was for indemnification because the dealer-seller sought full satisfaction from the third party for any amounts it was required to pay.

Here, too, United General sought a full shifting of its liability for the shortage to the moving defendants. United General's liability did not arise from any fault of its own, but was imposed constructively by statute. United General and the defendants could not share in the loss, because United General had not committed any wrongdoing. There was no basis on which to allocate responsibility for the loss between it and the defendants. Consequently, United General's claim for restitution was not for contribution, but indemnification. And United General separately stated a claim for indemnification, which was ultimately determined after a jury trial. For that reason, this assignment of error lacks merit.

---

[17] See *id*.

[18] See, e.g., *Downey v. Western Comm. College Area*, 282 Neb. 970, 808 N.W.2d 839 (2012); *Kuhn v. Wells Fargo Bank of Neb.*, 278 Neb. 428, 771 N.W.2d 103 (2009); *Estate of Powell, supra* note 12.

[19] See *Downey, supra* note 18.

[20] *Warner v. Reagan Buick*, 240 Neb. 668, 483 N.W.2d 764 (1992).

(c) Constructive Trust

United General contends that it was entitled to a constructive trust because the moving defendants received unauthorized transfers from Guardian's escrow account for which it was liable by statute. It further argues that it should have been permitted to present evidence at trial tracing the unpaid premiums to the defendants' possession.

[14,15] We have defined a constructive trust as a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment.[21] Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.[22]

The district court concluded that a constructive trust was inappropriate because United General had no interest, equitable or otherwise, in the escrowed funds belonging to Guardian's customers. And as to unpaid premiums, the court determined that it was impossible to identify any unpaid premiums in the defendants' possession.

We agree that United General could not seek a constructive trust as to the escrowed funds belonging to Guardian's customers. The Restatement provides that a constructive trust may arise if the defendant is "unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights."[23] As discussed above, United General had no interest in any portion of the escrowed funds comprising the deposits of Guardian's customers. The

---

[21] See *Eggleston v. Kovacich*, 274 Neb. 579, 742 N.W.2d 471 (2007).

[22] *Id*.

[23] Restatement, *supra* note 15, § 55 at 296.

unauthorized transfers of these deposits were at the expense of Guardian's customers and in violation of their rights, not the rights of United General.

In contrast, any unauthorized transfers of the unpaid premiums were at United General's expense and in violation of its rights. And genuine issues of material fact existed as to whether the defendants received the unauthorized transfers as a result of fraud, misrepresentation, or an abuse of an influential or confidential relationship. The district court determined that it was impossible to trace the unpaid premiums to a specific defendant or account. But we see no basis for this conclusion.

[16] We have explained that where money is the asset upon which the trust is based, it is necessary that the specific amounts be identified and located, either by tracing the money to a specific and existing account, or where the funds have been converted into another type of asset such as by the purchase of real property, the money must be traced into the item of property.[24] There was no evidence establishing that it was impossible to trace the unpaid premiums to a specific defendant or account. We recognize that the court received evidence of numerous transactions involving Guardian's escrow account and the accounts of the defendant entities. But when viewed in the light most favorable to United General, this evidence was insufficient to establish that tracing the unpaid premiums was impossible. Thus, we conclude that with regard to United General's claim for unpaid premiums, the court erred in preventing it from seeking a constructive trust at trial.

## 2. TRIAL

### (a) Proposed Jury Instruction

United General contends that the district court committed reversible error in rejecting its proposed jury instruction as to liability for civil conspiracy. As noted above, United General requested an instruction that a conspirator is liable for the entire loss or damage caused by the wrongful act or tort

---

[24] See *Chalupa v. Chalupa*, 254 Neb. 59, 574 N.W.2d 509 (1998).

forming the basis of the conspiracy. United General further asserts that the court's jury instructions misstated the burden of proof.

[17-19] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[25] However, it is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.[26] If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[27]

[20,21] We have defined a civil conspiracy as a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[28] A "conspiracy" is not a separate and independent tort in itself, but, rather, is dependent upon the existence of an underlying tort.[29] Without such underlying tort, there can be no claim for relief for a conspiracy to commit the tort.[30]

[22,23] Additionally, the gist of an action for civil conspiracy is not the conspiracy charged, but the damages the plaintiff claims to have suffered because of the wrongful acts of the defendants.[31] Thus, by establishing a civil conspiracy,

---

[25] *InterCall, Inc., supra* note 6.

[26] *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 554 N.W.2d 769 (1996).

[27] *InterCall, Inc., supra* note 6.

[28] See *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005).

[29] See *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009).

[30] *Id.*

[31] *Treptow Co. v. Duncan Aviation, Inc.*, 210 Neb. 72, 313 N.W.2d 224 (1981).

a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission.[32] A conspirator is liable for the injuries sustained by the plaintiff as a result of the tortious conduct which forms the basis of the conspiracy.[33]

United General's proposed instruction was a correct statement of the law as to a conspirator's liability. However, the instructions given to the jury contained the substance of the proposed instruction. The jury was instructed that a claim of civil conspiracy serves "to impose vicarious liability for underlying wrongs of those who are party to conspiracy." And it was further instructed that "conspirators who have not acted but have promoted the act will be held liable." Thus, the instructions given by the district court correctly stated a conspirator's liability for the loss caused by the underlying wrongful act or tort. Because the instructions actually given, read as a whole, adequately addressed the matter, the court did not err in rejecting the proposed instruction.

[24] As to United General's assertion regarding the burden of proof, it contends that the instructions given to the jury could have been interpreted as requiring all of the defendants to have committed the wrongful act forming the basis of the conspiracy. However, United General failed to make an appropriate objection before the district court. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error.[34] Further, the instruction given to the jury on the burden of proof accurately stated United General's burden. The instruction provided that United General was required to prove that at least one of the defendants committed an actionable wrong and that one or more of the defendants conspired in its commission. This was a correct statement of the law. United General's assertion is without merit.

---

[32] See 15A C.J.S. *Conspiracy* § 8 (2012).

[33] See *id*.

[34] *Tolliver v. Visiting Nurse Assn*., 278 Neb. 532, 771 N.W.2d 908 (2009).

### (b) Motion to Amend and Directed Verdict

United General contends that the district court erred in overruling its motion to amend the complaint and in directing a verdict in Fidelis' favor. It argues that Fidelis gave implied consent to the determination of successor liability at trial by failing to object to the admission of relevant evidence.

The amendment of a pleading is governed by Neb. Ct. R. Pldg. § 6-1115. Section 6-1115(b) provides that when issues not raised by the pleadings have been tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment.[35]

[25] We have previously set forth the inquiry for whether an unpleaded issue was tried by the consent of the parties.[36] The key inquiry of § 6-1115(b) for "express or implied consent" to trial of an issue not presented by the pleadings is whether the parties recognized that an issue not presented by the pleadings entered the case at trial.[37] United General does not allege that Fidelis gave express consent to the determination of successor liability. Consequently, we limit our analysis to implied consent.

[26-28] We have observed that implied consent may arise in two situations:

> "First, the claim may be introduced outside of the complaint—in another pleading or document—and then treated by the opposing party as if pleaded. Second, consent may be implied if during the trial the party acquiesces or fails to object to the introduction of evidence that relates only to that issue.

---

[35] See § 6-1115(b).

[36] See *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

[37] See *id.*

"Implied consent may not be found if the opposing party did not recognize that new matters were at issue during the trial. The pleader must demonstrate that the opposing party understood that the evidence in question was introduced to prove new issues."[38]

To satisfy § 6-1115(b), evidence to which no objection is raised must be directed solely at the unpleaded issue, in order to provide a clear indication that the opposing party would or should have recognized that a new issue was being injected into the case.[39]

As to specific evidence of successor liability introduced at trial, United General points to Malone's testimony concerning his interests in IPR and Fidelis, the formation of Fidelis, and Fidelis' relation to IPR. It further points to the asset purchase agreement between IPR and Fidelis.

But the evidence cited by United General was not directed solely at the issue of successor liability. Malone's testimony as to his interests in IPR and Fidelis and Fidelis' relation to IPR was relevant to establish the extent of Malone's involvement in both entities. And the asset purchase agreement was similarly relevant to the issue of Malone's involvement in Fidelis. Because Malone was at the heart of the embezzlement from Guardian's escrow account, this evidence was relevant to both the civil conspiracy and indemnification claims.

[29] We acknowledge that some aspects of Malone's testimony and the asset purchase agreement touched upon the issue of successor liability. But the evidence was also relevant to the issues raised in United General's complaint. It was not of such a nature as to put Fidelis on notice that an issue not presented by the pleadings had been injected into the case at trial. We therefore reject United General's assertion that Fidelis gave implied consent to the determination of successor liability. A court will not imply consent to try a claim merely because

---

[38] *Id*. at 817, 708 N.W.2d at 244 (emphasis omitted), quoting 3 James Wm. Moore et al., Moore's Federal Practice § 15.18[1] (3d ed. 2005).

[39] See *id*.

evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.[40]

[30] And because successor liability was not tried by the express or implied consent of the parties, we find no abuse of discretion in the overruling of United General's motion to amend the complaint. Our case law provides that a trial court's denial of leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the nonmoving party can be demonstrated.[41] But United General did not move to amend the complaint until after the close of all the evidence. And Fidelis argued that it would have presented additional evidence had a claim of successor liability been raised in the pleadings. We therefore conclude that Fidelis successfully established that it would have been unfairly prejudiced by the insertion of a new claim, without the opportunity to present relevant evidence.

We similarly find no error in the entry of a directed verdict in Fidelis' favor. The uncontroverted evidence established that Fidelis was not in existence at the time of the transfers from Guardian's escrow account. Fidelis could not have participated in the transfers, and it could not have received any of the escrowed funds. Thus, no basis existed for United General's claims against Fidelis.

### (c) Judgment Notwithstanding Verdict

United General contends that the district court erred in granting judgment notwithstanding the verdict on its claim for indemnification. It claims that under Nebraska law, a party may assert indemnification as an independent claim. And it argues that the district court failed to apply indemnification as an independent claim by requiring that the defendants have some degree of fault for the shortage in Guardian's escrow account.

---

[40] *Id*.

[41] See *Gonzalez v. Union Pacific RR. Co*., 282 Neb. 47, 803 N.W.2d 424 (2011).

[31,32] United General correctly recognizes that indemnification may be asserted as an independent claim under Nebraska law. Absent a contractual arrangement, the right to indemnity has its roots in equity.[42] Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay, or has agreed to pay, unless the party making the payment is barred by the wrongful nature of his conduct.[43]

We find no merit to United General's assertion that the district court failed to apply indemnification as an independent claim. Rather, in granting judgment notwithstanding the verdict, the court concluded that United General could not obtain indemnification from Maple Office Partners, Via Christe, Northwest Village, and Angel Guardians. The jury found that these defendants did not conspire in the embezzlement from Guardian's escrow account. Thus, the court determined that they were without fault for the injury to Guardian's customers.

We agree that the absence of fault was fatal to United General's indemnification claim against the above four defendants. Because these defendants were found to be without fault for the embezzlement, they were not liable to Guardian's customers for the conversion of the escrowed funds. Any liability to Guardian's customers existed solely in restitution, to the extent that they used or possessed any of the escrowed funds.

Consequently, United General was not entitled to seek indemnification from the four defendants. We have explained that one who is "secondarily," "technically," "constructively," or "vicariously" liable may seek indemnification from an active wrongdoer.[44] Although United General was constructively liable for the missing escrowed funds pursuant to a statute,[45]

---

[42] See, *Warner, supra* note 20; *City of Wood River v. Geer-Melkus Constr. Co.*, 233 Neb. 179, 444 N.W.2d 305 (1989).

[43] *Warner, supra* note 20.

[44] See *Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc.*, 232 Neb. 763, 443 N.W.2d 872 (1989).

[45] See § 44-1993(8).

its liability was not premised upon the active wrongdoing or primary liability of the four defendants. They did not commit any act or breach of duty causing injury to Guardian's customers and giving rise to United General's liability. Thus, by covering the shortage in the escrow account, United General did not discharge a debt that should have been paid wholly by the four defendants.[46]

We recognize that the four defendants received a benefit from United General's payment of the shortage in the escrow account and that they may have been unjustly enriched. As noted above, the four defendants were subject to liability to Guardian's customers for restitution of any escrowed funds that they used or had in their possession. And by covering the shortage, United General fulfilled this obligation and extinguished the defendants' potential liability. But United General did not pursue a claim of equitable subrogation, and we decline to comment on the merits of such a claim on appeal. It sought indemnification, which it was not entitled to obtain from the four defendants. This assignment of error is without merit.

## VI. CONCLUSION

We find no merit to the errors that United General asserts occurred at trial. And we agree with the district court's disposition of the motion for summary judgment, with the exception of United General's claims for conversion and a constructive trust. United General had an immediate right to possession of the unpaid premiums, and no evidence was received at the summary judgment hearing establishing that the unpaid premiums could not be traced to a specific defendant or account. We therefore affirm in part, and in part reverse and remand for further proceedings.

Affirmed in part, and in part reversed and remanded for further proceedings.

---

[46] See *Downey, supra* note 18.